# Title III Electronic Surveillance Material and the Intelligence Community

Under Title III of the Omnibus Crime Control and Safe Streets Act, law enforcement officials may share with the intelligence community information obtained through surveillance authorized by courts pursuant to Title III where it is done to obtain assistance in preventing, investigating, or prosecuting a crime.

Law enforcement may also share with the intelligence community information obtained through surveillance authorized by courts pursuant to Title III where the information is of overriding importance to national security or foreign relations and disclosure is necessary for the President to discharge his constitutional responsibilities over these matters.

October 17, 2000

MEMORANDUM OPINION FOR THE COUNSEL
OFFICE OF INTELLIGENCE POLICY AND REVIEW

You have requested our opinion on the extent to which law enforcement officials may share with the intelligence community information obtained through court-authorized electronic surveillance pursuant to Title III of the Omnibus Crime Control and Safe Streets Act. We believe that such information may be shared in limited situations, namely, (1) where law enforcement shares the information with the intelligence community to obtain assistance in preventing, investigating, or prosecuting a crime; and (2) where the information is of overriding importance to national security or foreign relations and where disclosure is necessary for the President to discharge his constitutional responsibilities over these matters. As we have noted in a similar context, "this constitutional authority should not be exercised as a matter of course, but rather only in extraordinary circumstances and with great care." *Disclosure of Grand Jury Material to the Intelligence Community*, 21 Op. O.L.C. 159, 160 (1997). Given the extraordinary nature of this authority, we recommend that proper officials (e.g., the Attorney General or the Deputy Attorney General) be consulted before any such constitutionally-based disclosure is made.

I.

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2522 (1994 & Supp. II 1996), requires the government, unless otherwise permitted, to obtain an order of a court before conducting electronic surveillance. The government is permitted to seek such orders only in connection with the

investigation of the criminal offenses enumerated in § 2516 of title 18.[1] Any interception not permitted by Title III is prohibited and subject to criminal and civil sanctions.[2]

Title III also governs the subsequent use and disclosure of information obtained as a result of court-authorized electronic surveillance.[3] Section 2517 of title 18 provides in pertinent part:

> (1) Any investigative or law enforcement officer who, by any means authorized by this chapter, has obtained knowledge of the contents of any wire, oral, or electronic communication, or evidence derived therefrom, may disclose such contents to another investigative or law enforcement officer to the extent that such disclosure is appropriate to the proper performance of the official duties of the officer making or receiving the disclosure.

> (2) Any investigative or law enforcement officer who, by any means authorized by this chapter, has obtained knowledge of the contents of any wire, oral, or electronic communication or evidence derived therefrom may use such contents to the extent such use is appropriate to the proper performance of his official duties.[4]

18 U.S.C. § 2517 (1994). Section 2517(1) thus permits disclosure of court-authorized Title III information from one "investigative or law enforcement officer" to another, while Title III Electronic Surveillance Material and the Intelligence Community § 2517(2) permits an "investigative or law enforcement officer" law-

---

[1] 18 U S C. § 2516 (1994 & Supp II 1996). With respect to the authority to intercept communications in connection with federal investigations, § 2516 distinguishes between wire and oral communications, on the one hand, and electronic communications, on the other. Section 2516(1) empowers certain senior officials in the Department of Justice to authorize an application for a court order approving interception of wire and oral communications where the interception may provide evidence of certain serious federal offenses, such as bribery, unlawful use of explosives, witness tampering, assassination, racketeering, gambling, embezzlement, bank fraud, sexual exploitation of children, mail fraud, counterfeiting, sale and transportation of obscene matter, and firearms violations Section 2516(3), in contrast, permits an application for interception of electronic communications where the interception may provide evidence of any federal felony.

With respect to the authority to intercept communications in connection with state investigations, § 2516(2) does not distinguish among wire, oral, and electronic communications. Section 2516(2) empowers the principal prosecuting attorney of a state or subdivision thereof to apply to a state court for an intercept order in conformity with Title III, if state law also authorizes such an application and if the interception would provide evidence of certain serious offenses, including murder, kidnapping, gambling, and extortion.

[2] In this memorandum, we do not address and express no opinion regarding use and disclosure of electronic surveillance information obtained in conformity with Title III but without a court order, such as one-party consent recordings In addition, we do not consider electronic surveillance information obtained pursuant to the Foreign Intelligence Surveillance Act of 1978, 50 U S.C. §§ 1801–1811 (1994).

[3] For purposes of this memorandum, we assume that the information to be shared was obtained pursuant to and maintained in conformity with all of the requirements of Title III

[4] Section 2517(3) further permits the lawful recipient of Title III information to disclose that information while testifying under oath in court or similar proceedings Section 2517(5) authorizes use and disclosure as permitted in § 2517(1) and (2) of Title III information relating to offenses other than those specified in the electronic surveillance application

fully in possession of Title III information to "use" the information. The disclosure or use of information under these two sections must be "appropriate to the proper performance of the official duties" of the investigative or law enforcement officers involved. A number of courts have stated that, under Title III, any electronic surveillance or subsequent disclosure of Title III information is prohibited unless expressly permitted. *See In re Grand Jury*, 111 F.3d 1066, 1078 (3d Cir. 1997); *In re Motion to Unseal Elec. Surveillance Evidence (Smith v. Lipton)*, 990 F.2d 1015, 1018 (8th Cir. 1993); *United States v. Underhill*, 813 F.2d 105, 107 (6th Cir.), *cert. denied*, 482 U.S. 906 (1987); *United States v. Dorfman*, 690 F.2d 1230, 1232 (7th Cir. 1982).

## II.

## A.

Section 2517(1) permits disclosure of Title III information from one "investigative or law enforcement officer" to another, "to the extent that such disclosure is appropriate to the proper performance of the official duties" of the officer making or receiving the disclosure. Section 2510(7) of title 18 defines "investigative or law enforcement officer" as follows:

> "Investigative or law enforcement officer" means any officer of the United States or of a State or political subdivision thereof, who is empowered by law to conduct investigations of or to make arrests for offenses enumerated in this chapter, and any attorney authorized by law to prosecute or participate in the prosecution of such offenses.

18 U.S.C. § 2510(7) (1994). Courts have taken a reasonably broad view of the scope of this definition, holding, for example, that § 2510(7) covers an Assistant United States Attorney working on a civil forfeiture case, *United States v. All Right, Title and Interest in Five Parcels of Real Property and Appurtenances Thereto Known as 64 Lovers Lane*, 830 F. Supp. 750, 760 (S.D.N.Y. 1993), the committee of the House of Representatives considering the impeachment of a federal judge, *In re Grand Jury Proceedings (Appeal of Judge Alcee L. Hastings)*, 841 F.2d 1048 (11th Cir. 1988), as well as a state attorney grievance commission empowered by law to investigate the offenses enumerated in 18 U.S.C. § 2516, *In re Elec. Surveillance (Berg v. Michigan Attorney Grievance Comm'n)*, 49 F.3d 1188 (6th Cir. 1995). Several courts have held that prison officials are also within the definition of § 2510(7). *See, e.g., United States v. Sababu*, 891 F.2d 1308, 1328–29 (7th Cir. 1989). *See also Bureau of Prisons Disclosure of Recorded Inmate Telephone Conversations*, 21 Op. O.L.C. 11, 15 n.10 (1997). An "inves-

tigative or law enforcement officer,'' however, must have the power to investigate or make arrests for offenses enumerated in § 2516.[5] Absent some specific authority to investigate or make arrests for such offenses, a member of the intelligence community is not an investigative or law enforcement officer for purposes of Title III. We are aware of no such authority.[6] As a result, § 2517(1), which permits disclosure of Title III information to other investigative or law enforcement officers, does not apply to disclosures to the intelligence community.[7] Accordingly, if an investigative or law enforcement officer is permitted to disclose Title III information to a member of the intelligence community, that disclosure must constitute a ''use'' that is ''appropriate to the proper performance of the official duties'' of the disclosing officer.

## B.

We must therefore consider the circumstances under which sharing information with the intelligence community would be ''appropriate to the proper performance of [the] official duties'' of a law enforcement officer. For the reasons that follow, we conclude that the text, legislative history, and purpose of Title III suggest that disclosure to the intelligence community would be permissible when an investigative or law enforcement officer seeks to obtain assistance in the prevention, investigation, or prosecution of a criminal offense.

The structure of § 2517 suggests that Congress intended the phrase ''appropriate to the proper performance of . . . official duties'' to be construed narrowly. Congress included the limiting phrase both in § 2517(1), governing one law enforcement officer's disclosure of intercepted communications to another, and in § 2517(2), governing a law enforcement officer's use of intercepted communications. In support of an expansive reading of the phrase in § 2517(2), it could be argued that a government employee in one agency has a general duty to share with another government entity information that would be relevant to the latter's

---

[5] Such offenses would include all federal felonies, *see* 18 U S C § 2516(1), (3), and state offenses designated in § 2516(2) *See supra* note 1.

[6] We note that the Central Intelligence Agency (''CIA'') is specifically denied by statute ''police, subpoena, or law enforcement powers or internal security functions '' 50 U S.C. § 403–3(d)(1) (1994). As discussed below, however, we do not believe that statutory restrictions on the domestic or law enforcement activities of the CIA (or other agencies within the intelligence community) would prevent officers within the intelligence community from providing certain assistance to law enforcement officers upon request. *See infra* pp. 270–71.

[7] When we refer to the intelligence community in this context, we do mean to include those members, such as FBI agents, who meet the statutory definition of an ''investigative or law enforcement officer '' We recognize that officers empowered to investigate violations of the offenses enumerated in § 2516 could also have duties related to counterintelligence that do not involve prevention, investigation, or prosecution of criminal conduct. In such circumstances, disclosure of Title III information is permissible under § 2517(1) if the disclosure is ''appropriate to the proper performance of the official duties of the officer making or receiving the disclosure '' As discussed *infra* section II B, Congress appears to have intended the phrase ''appropriate to the proper performance of the official duties'' to encompass duties related to the prevention, investigation, or prosecution of criminal conduct. Accordingly, we do not believe that Title III would authorize the disclosure of electronic surveillance information solely for intelligence purposes, even if the disclosing or receiving officer is also authorized to perform law enforcement functions. *See also infra* note 12.

mission, and that it would therefore be "appropriate to the proper performance" of a law enforcement officer's duties to share Title III information with another government agency for purposes entirely unrelated to the law enforcement officer's own investigative activities. This broad construction of the phrase "appropriate to the proper performance of . . . official duties" in § 2517(2), however, cannot be squared with the existence of the virtually identical phrase in § 2517(1). First, under basic canons of statutory construction, the phrases must be interpreted consistently. *See, e.g., Sullivan v. Stroop*, 496 U.S. 478, 484–85 (1990); *United Sav. Ass'n v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988). If § 2517(2) broadly permits the disclosure of Title III information to individuals who are not law enforcement officers for purposes unrelated to law enforcement, then § 2517(1) would permit disclosure among law enforcement officers also for purposes unrelated to law enforcement. If so, the phrase "appropriate to the proper performance of . . . official duties" would constitute only a highly elastic limitation on disclosure among law enforcement officers — a result that seems unlikely in light of Congress's effort in Title III to protect privacy to the maximum extent possible, consistent with permitting electronic surveillance for law enforcement purposes, *see infra* pp. 268–70. The most natural reading of the language is, to the contrary, that the disclosure must be appropriate to the proper performance of *law enforcement* duties. Second, had Congress intended to permit broad sharing of Title III information among government entities with varying missions, it could more easily have done so in § 2517(1), by authorizing law enforcement officers to disclose Title III information to government employees generally rather than solely to other law enforcement officers.

The legislative history of Title III and the case law support an interpretation confining the phrase "appropriate to the proper performance of . . . official duties" in § 2517(1) and (2) to the law enforcement functions of the officer. The only nontestimonial use of Title III information discussed in the legislative history of Title III is the "use of the contents of intercepted communications, for example, to establish probable cause for arrest, to establish probable cause to search, or to develop witnesses." S. Rep. No. 90–1097, at 99 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2188 (citations omitted). Relying on this passage, the U.S. Court of Appeals for the District of Columbia Circuit has stated that Congress sought in § 2517 to serve "criminal law investigation and enforcement objectives." *American Friends Serv. Comm. v. Webster*, 720 F.2d 29, 73 (D.C. Cir. 1983) (invalidating order authorizing National Archives and Records Service to inspect Title III materials held by the FBI in part because disclosure to the Archives would not serve law enforcement objectives and therefore would not be authorized by § 2517(1) or (2)); *see In re Disciplinary Proceedings Against Spinelli*, 515 A.2d 825, 830–31 (N.J. Super. Ct. Law Div. 1986) (holding that disclosure provisions of state statute similar to § 2517 did not authorize release of wiretap material to police chief for disciplinary proceedings against officer

because this was an employment, not a law enforcement, use); *see also Lam Lek Chong v. DEA*, 929 F.2d 729, 734 (D.C. Cir. 1991) (following *Webster*). Consistent with this legislative purpose, the uses of Title III information permitted by courts have all related to law enforcement. *See, e.g., Certain Interested Individuals v. Pulitzer Pub'g Co.*, 895 F.2d 460, 465 (8th Cir.) (use of Title III information to obtain search warrant), *cert. denied*, 498 U.S. 880 (1990); *United States v. Gerena*, 869 F.2d 82, 84–86 (2d Cir. 1989) (use of Title III information in legal briefs and memoranda filed under seal with court); *United States v. O'Connell*, 841 F.2d 1408, 1417–18 (8th Cir.) (disclosure of Title III information to a secretary and to an intelligence analyst who were assisting the law enforcement officer in the investigation was "probably" permissible under § 2517(2)), *cert. denied*, 487 U.S. 1210 (1988); *United States v. Ricco*, 566 F.2d 433, 435 (2d Cir. 1977) (use of suppressed Title III wiretaps to refresh a witness's recollection for trial), *cert. denied*, 436 U.S. 926 (1978); *United States v. Rabstein*, 554 F.2d 190, 193 (5th Cir. 1977) (use of duplicate tapes during investigation to obtain voice identifications); *United States v. Hall*, 543 F.2d 1229, 1233 (9th Cir. 1976) (use of Title III information to make an arrest and conduct subsequent search), *cert. denied*, 429 U.S. 1075 (1977); *United States v. Vento*, 533 F.2d 838, 855 (3d Cir. 1976) (use of Title III information to obtain an additional wiretap authorization); *United States v. Canon*, 404 F. Supp. 841, 848–49 (N.D. Ala. 1975) (use of duplicate tapes during investigation to obtain voice identifications); *see also United States v. Martinez*, 101 F.3d 684 (Table), 1996 WL 281570 (2d Cir. 1996) (unpublished opinion) (allowing informant to listen to Title III tapes during the investigation is permitted under § 2517(2)), *cert. denied*, 520 U.S. 1270 (1997); *Birdseye v. Driscoll*, 534 A.2d 548, 552 (Pa. Commw. Ct. 1987) (use by prosecutors of electronic surveillance information in appeal from trial court order permissible under state statute modeled after Title III).

The principal cases suggesting a possible exception to the "law enforcement only" rule are several involving the disclosure of Title III information to the IRS for civil tax purposes. In these cases, courts permitted use of the Title III information in the civil tax proceeding. *See Spatafore v. United States*, 752 F.2d 415, 417–18 (9th Cir. 1985); *Griffin v. United States*, 588 F.2d 521, 525–26 (5th Cir. 1979); *Fleming v. United States*, 547 F.2d 872, 873–74 (5th Cir.), *cert. denied*, 434 U.S. 831 (1977); *Estate of Robert W. Best v. Commissioner*, 76 T.C. 122, 140–42 (1981). Each court relied, however, on the fact that the information had already been publicly disclosed in court in a criminal prosecution. None of the courts addressed whether disclosure would have been permissible under § 2517(2) in the absence of prior disclosure in the criminal action. The legislative history of Title III explicitly states that the statute was not intended to restrict disclosure of information already publicly known. *See* S. Rep. No. 90–1097, at 93, *reprinted in* 1968 U.S.C.C.A.N. at 2181 ("The disclosure of the contents of an intercepted communication that had already become 'public information' or 'common knowl-

edge' would not be prohibited."). Accordingly, we do not believe that this line of cases speaks directly to the circumstances under which § 2517(2) permits law enforcement officers to disclose Title III information. Similarly, although the Sixth Circuit in *Resha v. United States*, 767 F.2d 285 (6th Cir. 1985), permitted introduction in a civil tax proceeding of Title III information provided to the IRS by law enforcement officers, the court declined to address whether § 2517(2) authorized the disclosure. No criminal prosecution had resulted from the wiretaps, and, accordingly, the Title III information had not been disclosed in court. In the civil tax proceeding, the trial court excluded the Title III information. The appellate court reversed, holding that Title III's prohibition on the use of intercepted wire or oral communications in court, 18 U.S.C. § 2515, requires exclusion when the original wiretap is illegal, but not when lawfully obtained information is illegally disclosed. Because the court concluded that § 2515 did not bar introduction of the Title III information whether or not § 2517(2) permitted the FBI to disclose the information to the IRS, the court declined to address whether the disclosure was proper.[8]

The conclusion that § 2517(2) authorizes disclosure of Title III material only for purposes related to law enforcement is buttressed by the purpose of Title III: to maximize privacy, consistent with permitting electronic surveillance for law enforcement purposes. Title III was passed in response to the Supreme Court's decisions in *Katz v. United States*, 389 U.S. 347 (1967), which held that electronic surveillance was a search under the Fourth Amendment and thus required a court-approved search warrant, and *Berger v. New York*, 388 U.S. 41 (1967), which set forth stringent particularity requirements for electronic surveillance warrants. Title III represented a compromise between those who would have prohibited electronic surveillance altogether and those who wanted broadly to permit its use for

---

[8] In *Boettger v. Miklich*, 633 A 2d 1146 (Pa 1993), the Pennsylvania Supreme Court held that a state provision virtually identical to § 2517(2) prohibited a law enforcement officer from disclosing wiretap information to federal and state tax authorities. In addition, although the Sixth Circuit in *Resha* held that § 2515 does not prohibit the introduction in civil proceedings of lawfully intercepted but illegally disclosed information and declined to address whether § 2517(2) authorized the disclosure, the court below had directly considered the issue and had held that § 2517(2) did not authorize the disclosure *See Scott v. United States*, 573 F. Supp. 622, 625 (M D Tenn 1983), *rev'd on other grounds sub nom Resha v United States*, 767 F.2d 285 (6th Cir. 1985), *cert denied*, 475 U S 1081 (1986). Accordingly, the only two cases directly addressing whether § 2517(2) authorizes law enforcement officers to provide Title III material to tax authorities — *Scott* and *Boettger* — held that such disclosure violated the statute

One other case might arguably be interpreted to suggest an exception to the "law enforcement only" rule. In *64 Lovers Lane*, 830 F. Supp. at 760, the court upheld the disclosure of wiretap evidence by state law enforcement officers to an Assistant United States Attorney ("AUSA") prosecuting a civil forfeiture action arising out of the state criminal investigation The court's analysis in that case was principally, if not exclusively, focused on the applicability of the statutory definition of an "investigative or law enforcement officer," as this appears to have been the only issue raised *Id*. Regarding "appropriate use," the opinion simply states· "Since receipt and use of wiretap evidence is plainly appropriate for Assistant United States Attorneys prosecuting a civil forfeiture proceeding, disclosure of wiretap evidence to them would seem covered by § 2517(1)" *Id* The opinion contains no further analysis or discussion of the issue We note, however, that the decision is not necessarily inconsistent with the "law enforcement only" rule In addition to criminal prosecutions, the rule also arguably might extend, at least in certain circumstances, to other types of judicial or trial proceedings that grow out of a criminal investigation *Cf In re Grand Jury Proceedings*, 841 F 2d at 1054 (congressional committee is an "investigative officer" for purposes of 18 U S C § 2517(1) when conducting impeachment proceeding)

law enforcement. *See Certain Interested Individuals*, 895 F.2d at 467; *Gerena*, 869 F.2d at 84; *In re Application of Nat'l Broad. Co.*, 735 F.2d 51, 53 (2d Cir. 1984). The Supreme Court, in an oft-quoted passage, has said that "although Title III authorizes invasions of individual privacy under certain circumstances, the protection of privacy was an overriding congressional concern." *Gelbard v. United States*, 408 U.S. 41, 48 (1972) (footnote omitted); *see also Forsyth v. Barr*, 19 F.3d 1527, 1534 (5th Cir. 1994) (quoting *Gelbard*); *Lam Lek Chong*, 929 F.2d at 732 (same); *In re Motion to Unseal Elec. Surveillance Evidence*, 990 F.2d at 1018 (same); *In re Application of Nat'l Broad. Co.*, 735 F.2d at 53 (same); *In re New York Times (United States v. Biaggi)*, 828 F.2d 110, 115 (2d Cir. 1987) ("It is obvious that although Title III authorizes invasions of individual privacy upon compliance with certain stringent conditions, the protection of privacy was an overriding congressional concern."); *United States v. Cianfrani*, 573 F.2d 835, 856 (3d Cir. 1978) ("Congress's overriding interest in protecting privacy to the maximum extent possible is evident in Title III. The legislative history of the statute emphasizes the concern of its drafters that the Act preserve as much as could be preserved of the privacy of communications, consistent with the legitimate law enforcement needs that the statute also sought to effectuate.").

Reflecting this concern for privacy, the First and Third Circuits have held that the government may not introduce in a criminal prosecution wire or oral communications obtained in violation of Title III, or evidence derived therefrom, even when private parties having no connection to the government unlawfully intercepted the communications. *See* 18 U.S.C. § 2515;[9] *In re Grand Jury*, 111 F.3d at 1077; *United States v. Vest*, 813 F.2d 477, 481 (1st Cir. 1987). *Contra United States v. Murdock*, 63 F.3d 1391, 1404 (6th Cir. 1995), *cert. denied*, 517 U.S. 1187 (1996). Similarly, the D.C. and Ninth Circuits have held that § 2511(1)(c) and (d) prohibit a law enforcement officer from disclosing or using communications if the officer has reason to know that a private party intercepted such communications unlawfully, and that § 2517(1) and (2) do not establish an exception to this prohibition. *Berry v. Funk*, 146 F.3d 1003, 1012–13 (D.C. Cir. 1998); *Chandler v. United States Army*, 125 F.3d 1296, 1301–02 (9th Cir. 1997). *But see Forsyth*, 19 F.3d at 1545 (holding that, where government was unaware for the bulk of its investigation that communications were illegally intercepted, use and disclosure of illegally intercepted communications was permissible; suggesting in dicta that government could use and disclose communications even if it knew that the private party who provided the communications had intercepted them unlawfully). Additionally, several courts have found that the privacy interests protected by Title III outweigh the public's and the press's qualified right of access to materials filed in connection with pretrial proceedings, where such access would

---

[9] Section 2515 provides that no wire or oral communication or evidence derived therefrom may be introduced in any judicial, administrative, or legislative proceeding if "the disclosure of that information would be in violation of this chapter." Section 2515 does not cover electronic communications.

reveal communications intercepted by law enforcement and the parties to the intercepted communications have not yet had the opportunity to challenge the legality of law enforcement's action.[10]

For all of these reasons, we conclude that the phrase "use . . . appropriate to the proper performance of . . . official duties" under § 2517(2) comprehends use by the law enforcement officer in his or her law enforcement work. It does not follow, however, that Title III information can never be shared with persons who are not law enforcement officers. Courts have recognized that a "use . . . appropriate to the proper performance of [the law enforcement officer's] official duties" under § 2517(2) may involve the disclosure of Title III information to persons who are not law enforcement officers for the purpose of obtaining assistance in enforcing the law. For example, in obtaining a voice identification, a law enforcement officer may disclose electronic surveillance information to a potential witness without violating Title III. *See, e.g., Canon,* 404 F. Supp. at 848–49. Similarly, we believe that a law enforcement officer may disclose information obtained through a Title III intercept to an officer within the intelligence community in order to acquire intelligence information relevant to preventing, investigating, or prosecuting a crime. As we concluded with respect to grand jury materials, *see Disclosure of Grand Jury Material to the Intelligence Community,* 21 Op. O.L.C. at 161, despite statutory restrictions on the CIA's role in exercising domestic or law enforcement functions, the CIA may engage in activities, such as collecting and providing information in response to specific requests from law enforcement or general law enforcement requirements, that do not constitute the exercise of law enforcement powers. *Cf.* 50 U.S.C. § 403–5a (Supp. II 1996) (authorizing elements of the intelligence community, "upon the request of a United States law enforcement agency," to "collect information outside the United States about individuals who are not United States persons. Such elements may collect such information notwithstanding that the law enforcement agency intends to use the

---

[10] *See, e.g., Certain Interested Individuals,* 895 F 2d at 466–67 (recognizing qualified First Amendment right of access to affidavits filed in support of search warrant and containing Title III material, but upholding order redacting Title III materials where individuals had not been indicted), *In re Globe Newspaper Co,* 729 F 2d 47, 53–54 (1st Cir 1984) (upholding order closing bail hearing that would reveal Title III material, where defendants had not yet had an opportunity to test whether law enforcement legally obtained the Title III material), *Dorfman,* 690 F.2d at 1234–35, 1233 (holding that First Amendment does not require unsealing of Title III evidence submitted in a suppression hearing, noting that "the strict prohibition in Title III against disclosure of unlawfully obtained wiretap evidence would be undermined by public disclosure of wiretap evidence at a suppression hearing before the judge ruled on the lawfulness of the wiretaps"), *Cianfrani,* 573 F 2d at 856–57 & n 10 (acknowledging right of access to pretrial court proceedings, but concluding that limitations on disclosure are permissible where court has not yet determined the legality of the interception), *United States v. Shenberg,* 791 F Supp 292, 293–94 (S D Fla. 1991) (holding that, until admissibility of intercepted material has been determined, "the privacy interests of the defendants and the goal of Title III outweigh the public's interest in present access to the Title III intercepted conversations"); *In re Sealed Search Warrant for Cubic Corp.,* No 88–2945M, 1989 WL 16075, at *2–4 (S.D. Cal. Feb 22, 1989) (denying press access to portions of search warrant and affidavit reflecting intercepted communications, where parties to intercepted communications had not been charged with a crime), *see also Gerena,* 869 F.2d at 85–86 (acknowledging qualified First Amendment right of access to pretrial motion papers containing Title III materials; remanding for consideration of whether redaction or sealing of such materials was required to protect defendants' privacy and fair trial interests)

information collected for purposes of a law enforcement investigation or counter-intelligence investigation.'').

Thus, for example, a law enforcement officer may share electronic surveillance information arising in connection with a terrorism investigation with the intelligence community for the purpose of obtaining intelligence information concerning the structure of the terrorist organization or specific individuals who are under investigation.[11] Law enforcement officials are charged with investigating numerous crimes related to national security, and the assistance of the intelligence community may be essential to preventing, investigating, or prosecuting such crimes. *See, e.g.*, 28 U.S.C. § 533 note (1994) ("Subject to the authority of the Attorney General, the FBI shall supervise the conduct of all investigations of violations of the espionage laws of the United States by persons employed by or assigned to United States diplomatic missions abroad. All departments and agencies shall report immediately to the FBI any information concerning such a violation.''); 50 U.S.C. § 402a(c)(i)(A) (1994) (requiring agency heads to ensure that the FBI "is advised immediately of any information, regardless of its origin, which indicates that classified information is being, or may have been, disclosed in an unauthorized manner to a foreign power or an agent of a foreign power''). Foreign intelligence information may also assist law enforcement in preventing, investigating, or prosecuting crimes with an extraterritorial component, such as various narcotics offenses or financial crimes.

In sum, we conclude that § 2517(2) permits a law enforcement officer to share information obtained through court-authorized electronic surveillance with members of the intelligence community where the officer seeks to obtain assistance in preventing, investigating, or prosecuting a crime. A disclosure in these circumstances would constitute a "use . . . appropriate to the proper performance of [the law enforcement officer's] official duties." Disclosure of Title III information by law enforcement officers to members of the intelligence community, other than to obtain assistance in law enforcement activities, is not permitted by this section.[12]

---

[11] We discuss informational assistance by the intelligence community for illustrative purposes only. We do not intend to suggest that the intelligence community's role in assisting law enforcement is limited to providing informational support.

[12] We further conclude that Title III information lawfully disclosed by a law enforcement officer to a member of the intelligence community in order to obtain law enforcement assistance, or disclosed by one member of the intelligence community to another in order to carry out the request for assistance, may not thereafter be disclosed by the member of the intelligence community for intelligence purposes, unless the information has previously been publically disclosed. *Cf. infra* note 17 (distinguishing between disclosure in order to obtain law enforcement assistance and disclosure based on President's constitutional authority over national security or foreign relations). To be sure, Title III's explicit prohibitions on disclosure and use of intercepted communications extend only to illegally intercepted communications, 18 U.S.C § 2511(1)(c), (d) (criminalizing disclosure or use where an individual has reason to know that "the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection''), and legally intercepted communications where the disclosure is made "with intent to improperly obstruct, impede, or interfere with a duly authorized criminal investigation," *id* § 2511(1)(e) Nevertheless, § 2517 authorizes disclosure of lawfully obtained wire evidence by individuals who are not law enforcement officers only in the specific circumstance of testimony under oath, § 2517(3), thereby implying "that what is not permitted is forbidden, though not necessarily under pain of criminal punishment '' *Dorfman*, 690 F.2d at 1232,

## C.

In 1980, this Office opined that Title III permitted the Department "to disclose tapes of court-authorized interceptions of wire communications in response to a proper request or demand by a congressional committee unless, in the Department's judgment, such disclosure would be improper because of [the Department's] duty faithfully to execute the criminal laws." *See Disclosure of Court-Authorized Interceptions of Wire Communications to Congressional Committees*, 4B Op. O.L.C. 627, 627 (1980). This Office reached this conclusion by reasoning that the proper performance of the official duties of Department personnel includes responding to requests for information from congressional committees, and that such disclosure would constitute a "use" of Title III information "appropriate to the proper performance of [the law enforcement officer's] official duties" under § 2517(2). The analysis underlying the conclusion of our 1980 opinion is in some tension with cases decided since the opinion was issued, *see, e.g., Webster*, 720 F.2d at 73; *In re Disciplinary Proceedings Against Spinelli*, 515 A.2d at 830–31; *see also Lam Lek Chong*, 929 F.2d at 734, and with the analysis of the text, legislative history, and purpose of Title III set forth above, *see supra* pp. 265–70. To the extent that the analysis reflected in the 1980 opinion suggests that the phrase "appropriate performance of [the law enforcement officer's] official duties" includes all actions that law enforcement officers might take in their official capacities, regardless of whether they relate to law enforcement, the analysis is inconsistent with that set forth above and we therefore disavow it.[13]

---

*see also In re Motion to Unseal Elec. Surveillance Evidence*, 990 F.2d at 1018 ("'Congress provided for very limited disclosure of any wiretap evidence that is obtained    . When addressing disclosure of the contents of a wiretap, the question is whether Title III specifically authorizes such disclosure, not whether Title III specifically prohibits the disclosure, for Title III prohibits all disclosures not authorized therein."). If Congress intended to permit any person who lawfully receives Title III information to disclose it freely prior to its public disclosure in court, then § 2517(3), which authorizes a witness who has received such information to disclose it while giving testimony under oath, would be entirely superfluous

We recognize that, as a practical matter, Title III material may be reflected in the thinking of a member of the intelligence community (or a law enforcement officer who also has duties related to counterintelligence, *see supra* note 7), even if he or she does not disseminate the information The fact that a particular individual cannot purge a thought, however, does not mean that the dissemination of Title III information should be unrestricted

[13] As noted above, however, the U.S. Court of Appeals for the Eleventh Circuit has held that when Congress is effectively acting in a law enforcement capacity, such as when it considers impeachment, it may receive Title III information as an "investigative or law enforcement officer" under § 2517(1). *See In re Grand Jury Proceedings*, 841 F 2d at 1054 In dissent, Judge Jones took issue with this conclusion *Id* at 1057 ("I hold the view that to allow the House Committee to fall within this definition is to interpret the statute in a way in which Congress never intended and in a way in which it should not be construed ")

We note that the analysis of the 1980 opinion of this Office is at least implicitly inconsistent with the majority opinion in *Hastings* If law enforcement officers have a general duty to make Title III information available to other government entities that may benefit from it, then § 2517(2) would have authorized disclosure of the Title III information in question in *Hastings*, and the court never would have had to address whether Congress may receive information under § 2517(1) as an "investigative or law enforcement officer" when it considers impeachment

III.

We next consider the possible effect of § 104(a) of the National Security Act ("NSA"), which provides:

> To the extent recommended by the National Security Council and approved by the President, the Director of Central Intelligence shall have access to all intelligence related to the national security which is collected by any department, agency, or other entity of the United States.[14]

Section 1.6(a) of Executive Order No. 12333 implements the NSA and provides:

> The heads of all Executive Branch departments and agencies shall, in accordance with law and relevant procedures approved by the Attorney General under this Order, give the Director of Central Intelligence access to all information relevant to the national intelligence needs of the United States, and shall give due consideration to the requests from the Director of Central Intelligence for appropriate support for Intelligence Community activities.

36 C.F.R. 204 (1982). We have analyzed these provisions in a related memorandum [15] and will not repeat the analysis here. For purposes of this memorandum we will assume that, at least on some occasions, Title III electronic surveillance will yield information that would otherwise be disclosable under § 104(a) and the Executive Order. We conclude, however, for the same reasons that the NSA does not supersede or override restrictions on the use of grand jury information, that it also does not supersede or override the restrictions of Title III.

Title III prohibits every disclosure that it does not explicitly authorize. Nothing in the language of § 104(a) — a provision added to the National Security Act in 1992 — refers to Title III information, there is nothing in the legislative history of that section that suggests that Congress considered Title III information, and the implementing executive order is qualified by the phrase "in accordance with law," which at least suggests that existing law was not modified. Moreover, as we noted in our recent memorandum concerning grand jury disclosure, *see supra* note 15, the legislative history of § 104(a) suggests that Congress itself intended no change in existing law.

The Supreme Court held in *Illinois v. Abbott & Associates, Inc.*, 460 U.S. 557, 573 (1983), that the Court would not construe a statute as overriding pre-existing rules of grand jury secrecy unless Congress affirmatively expressed its intent to

---

[14] 50 U.S C. § 403–4(a) (1994). Section 104 of the National Security Act was added in 1992, as part of the Intelligence Authorization Act for Fiscal Year 1993. Pub. L. No. 102–496, § 705(a)(3), 106 Stat. 3188, 3192 (1992).

[15] *Disclosure of Grand Jury Material to the Intelligence Community*, 21 Op. O.L C at 161–67

do so. Title III does not have the historical roots of the grand jury secrecy rules. Nonetheless, a similar approach is appropriate. In *In re Application of National Broadcasting Co.*, 735 F.2d at 51, the Second Circuit considered a 1970 amendment to 18 U.S.C. § 2517(3). Section 2517(3) permits persons lawfully in possession of Title III information to disclose that information under oath in any proceeding held under the authority of the United States. Prior to 1970, such disclosure could be made only in criminal proceedings. Read literally, the 1970 amendment would permit civil litigants to compel the production of Title III information at trial. The Second Circuit found no evidence that Congress intended this result. Because of the privacy interests involved, the history of Title III as a compromise between those who wanted to ban wiretaps altogether and those who wanted broadly to permit electronic surveillance for law enforcement, the fact that Title III provided very limited exceptions to an otherwise complete ban on electronic surveillance, and the constitutional concerns that would be raised by a contrary conclusion, the Second Circuit refused to construe § 2517(3) to extend to civil litigants in the absence of evidence that Congress intended this result. 735 F.2d at 53–54.

In light of the privacy interests underlying Title III, and in the absence of at least some evidence that Congress intended to create a new exception to Title III's limits on disclosure, we believe it unlikely that a court would interpret § 104(a) to permit otherwise prohibited disclosure of Title III information to members of the intelligence community.

## IV.

Finally, we believe that in extraordinary circumstances electronic surveillance conducted pursuant to Title III may yield information of such importance to national security or foreign relations that the President's constitutional powers will permit disclosure of the information to the intelligence community notwithstanding the restrictions of Title III. The legal basis for this conclusion is set forth in our memorandum on grand jury disclosures. *See* 21 Op. O.L.C. at 172–75; *see also Disclosure of Grand Jury Matters to the President and Other Officials*, 17 Op. O.L.C. 59 (1993). As we stated there, the Constitution vests the President with responsibility over all matters within the executive branch that bear on national defense and foreign affairs, including, where necessary, the collection and dissemination of national security information.[16] Because ''[i]t is 'obvious and unarguable' that no governmental interest is more compelling than the security

---

[16] *Cf. Department of the Navy v. Egan*, 484 U S 518, 527 (1988) (''The President, after all, is the 'Commander in Chief of the Army and Navy of the United States ' U.S Const , Art II , § 2 His authority to . . . control access to information bearing on national security .    flows primarily from this constitutional investment of power . and exists quite apart from any explicit congressional grant.    . The authority to protect such information falls on the President as head of the Executive Branch and as Commander in Chief ''), House Permanent Select Committee on Intelligence, 106th Cong , *Record of Proceedings on H R. 3829, the Intelligence Community Whistleblower Protection Act* 11 (Comm. Print 1998) (Statement of Randolph D Moss)

of the Nation," *Haig v. Agee*, 453 U.S. 280, 307 (1981) (quoting *Aptheker v. Secretary of State*, 378 U.S. 500, 509 (1964)), the President has a powerful claim, under the Constitution, to receive information critical to the national security or foreign relations and to authorize its disclosure to the intelligence community. Where the President's authority concerning national security or foreign relations is in tension with a statutory rather than a constitutional rule, the statute cannot displace the President's constitutional authority and should be read to be "subject to an implied exception in deference to such presidential powers." *Rainbow Navigation, Inc. v. Department of the Navy*, 783 F.2d 1072, 1078 (D.C. Cir. 1986) (Scalia, J.). We believe that, if Title III limited the access of the President and his aides to information critical to national security or foreign relations, it would be unconstitutional as applied in those circumstances.

Accordingly, law enforcement officers who acquire information vital to national security or foreign relations would be obliged to convey it to the appropriate superiors (e.g., the United States Attorney), who would report it to the Attorney General or Deputy Attorney General, who would in turn report it to the President or his designee. The President (or appropriate officials acting on his behalf, such as the Attorney General) would be authorized to share such crucial information with his executive branch subordinates, including intelligence community officials, to the extent necessary to discharge his constitutional responsibilities.[17] Of course, this constitutional authority should not be exercised as a matter of course. Rather, it should only be exercised in extraordinary circumstances and with great care, and only where disclosure is necessary to the discharge of the President's constitutional responsibilities over matters of national security or foreign affairs. Even then, any contemplated exercise of this authority would necessitate careful consideration of the intrusion on privacy that might result.

Nor do we believe that disclosure of Title III information in these circumstances would violate the Fourth Amendment. Even if a disclosure of Title III information (as distinct from the seizure of the information) could otherwise violate the Fourth Amendment in some circumstances — a matter we do not address — we do not believe that this is an impediment to disclosure of Title III information of serious foreign affairs or national security import to the President. As we noted in our 1997 grand jury memorandum, the Supreme Court has recognized in other contexts that government actions overriding individual rights or interests may be justified where necessary to prevent serious damage to the national security or foreign policy of the United States. *See Haig*, 453 U.S. at 309 (invoking the principle that the Constitution's guarantees of individual rights do not make it a "suicide

---

[17] As previously noted, when law enforcement shares Title III information with the intelligence community to obtain assistance in law enforcement, that information may not subsequently be disclosed or used solely for intelligence purposes. *See supra* note 12. In contrast, when the President's constitutional authority over national security or foreign relations is the source of the authority to disclose Title III information to intelligence community officials, and when further disclosure within the community is necessary to the discharge of the President's constitutional responsibilities, Title III cannot constitutionally be applied to preclude such disclosure.

pact''); *American Communications Ass'n v. Douds*, 339 U.S. 382, 408–09 (1950) (to the same effect). We consider it very unlikely that the Court would conclude that the Fourth Amendment prohibits the disclosure of information vital to the national security or foreign relations of the United States.[18]

RANDOLPH D. MOSS
*Assistant Attorney General*
*Office of Legal Counsel*

---

[18] Indeed, courts have found a foreign intelligence exception to the warrant requirement of the Fourth Amendment *See, e.g., United States v Truong Dinh Hung*, 629 F.2d 908, 914 (4th Cir. 1980) (foreign intelligence exception to the Fourth Amendment warrant requirement, in view of "the need of the executive branch for flexibility, its practical experience, and its constitutional competence" for foreign affairs), *cert. denied*, 454 U S 1144 (1982); *see also United States v. United States District Court*, 407 U S 297, 321–22 (1972) (warrant required for domestic security electronic surveillance, but Court explicitly disclaims any intent to decide whether warrant clause applies to surveillance of foreign powers or their agents). The Foreign Intelligence Surveillance Act of 1978, 50 U S C §§ 1801–1811, permits foreign intelligence surveillance on a showing of probable cause that differs from that applicable in criminal cases, and if the surveillance discloses criminal activity, the information obtained through the surveillance may be admissible in a subsequent criminal prosecution. *See United States v Isa*, 923 F 2d 1300 (8th Cir. 1991), *United States v Pelton*, 835 F 2d 1067 (4th Cir. 1987), *cert denied*, 486 U.S. 1010 (1988). Consistent with these cases, we believe that, to the extent that the Fourth Amendment might otherwise limit disclosure of Title III information, disclosure of information vital to national security or foreign affairs similarly is not limited by the Fourth Amendment